IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

John W. Lee,                                              )
                                                         )
                    Plaintiff,                           )
            v.                                           )        CIV. ACT. NO. _____
                                                         )
Correct Care Solutions, LLC , or the                     )        Complaint
correct name of the business or corporation              )        Jury trial Requested
that owns or controls the company that                   )        Injunctive Relief
provides the employees and contractors                   )
who work(ed) at the Augusta-Richmond                     )
County jail  2016 to the present,                        )
and its successors and assigns, as a private             )
company and operating under color of law,                )
                                                         )
Correctional Medical Group Companies,                    )
and operating under color of law,                        )
                                                         )
Dr. Rogers, and/or any other John or                     )
Jane Doe Physician, individually as                      )
a contractor or as an employee for Correct               )
Care supervising medical care and staff at               )
the Augusta-Richmond County,                             )
Georgia jail, and operating under                        )
color of law, and as a policymaker,                      )
                                                         )
John and Jane Doe Supervisor(s)/                         )
Administrators whose true identity, number               )
and title are not known, individually and                )
officially, as a policymaker,                            )
under color of law,                                      )
                                                         )
John or Jane Does who fill roles with titles             )
Like Regional Manager, Health Services                   )
Administrator, Clinical Coordinator,                     )
Director of Nursing, Assistant Director                  )
Of Nursing and Mental Health Director,                   )
individually and as a policy maker,                      )
under color of law,                                      )
                                                         )
Jane Doe African American Doctor or                      )
Nurse, individually as a contractor or                   )
as an employee for Correct                               )

1

Care supervising medical care and staff at )
the Augusta-Richmond County, )
Georgia jail, and operating under )
color of law, and as a policymaker, )
 )
Nurse Sapp, individually as )
a contractor or as an employee for Correct )
Care supervising medical care and staff at )
the Augusta-Richmond County, )
Georgia jail, and operating under )
color of law, and as a policymaker, )
 )
The following nursing staff, individually as )
contractor or employee for Correct )
Care at the Augusta-Richmond County, )
Georgia jail, individually under color of )
law, in his or her official capacity, )
and/or as a policymaker: )
 )
Jane and John Doe Nurses, RN, )
LPN or other licenses, whose true name and )
and identity is unknown, )
 )
  Alisha Turvey, LPN, )
 )
  Bevelyn Coping, )
 )
  Chenis Turman, RN, )
 )
  Cynthia Witcher, LPN, )
 )
  Eunice Lowe, )
 )
  Jerrio Wallace, RN, )
 )
  Kimberly Cunningham, RN, )
 )
  Kenya Ervin, LPN, )
 )
  Kaydeen Porter, LPN, )
 )
  Patricia White, )
 )
  Rochelle Larry, LPN, )
 )
  Shedericka Edwards, )

Teresa Leslie, LPN,                                )
                                                   )
Willie Baldwin, LPN,                               )
                                                   )
Augusta-Richmond County,                           )
                                                   )
Mayor Hardy Davis in his official                  )
capacity,                                          )
                                                   )
Sheriff Richard Roundtree, individually            )
and in his official capacity and as                )
policy maker, under color of law                   )
                                                   )
Chief Jailer or Administrator                      )
Richmond County Sheriff's                          )
Department, individually and in his                )
official capacity and as a policy maker,           )
under color of law                                 )
                                                   )
Major Doe, individually and in his or her          )
official capacity, responsible for                 )
grievance response and correcting denials          )
of prescribed medication that resulted             )
in grievances,                                     )
                                                   )
All named entities, persons named, and             )
whose names are not known are sued                 )
individually and in their official capacity,       )
acting under color of law, for acting              )
in conspiracy with one another, and                )
they are sued jointly for their combined           )
negligent or intentional acts and                  )
inaction causing the complained of                 )
injury,                                            )
                                                   )
              Defendants.                           )
_____)

## COMPLAINT

COMES NOW, Plaintiff, John W. Lee, who shows the Court the following:

Jurisdiction and Venue

1.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) because this action asserts a deprivation of one or more federal constitutional rights through 42 U.S.C. § 1983.

2.      The Civil Rights Act of 1871, 42 U.S.C. § 1983, provides that any "person who, under color of [law] … subjects, or causes to be subjected, any [person] … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured…" for the injuries caused.

3.      This Complaint also asserts supplemental state claims under 28 U.S.C. § 1367.

4.      Venue is proper within the Augusta Division because the challenged incident occurred when Plaintiff was detained in the Augusta-Richmond County Jail, known as the Charles B. Webster Detention Center, 1941 Phinizy Road, Augusta, GA 30906.

Parties, Duties and Theories of Liability

5.      Plaintiff John W. Lee, a competent adult, brings this action for deprivation of the federal right to be free from medical treatment provided with deliberate indifference to known need causing injury and creating a substantial risk of serious injury, actionable under 42 U.S.C. § 1983, and state claims of medical malpractice, as supplemental state claims under 28 U.S.C. § 1367.

6.      Defendant Correct Care Solutions, LLC, is sued for actions and refusals to act, taken under color of law, as a corporation registered in Georgia, that had a contract or agreement with the Defendant Augusta-Richmond County, where the County has a duty under federal Constitution and the Constitution of the State of Georgia to provide medical care for detainees and inmates in the custody of Augusta Richmond County whereby Correct Care Solutions was to provide medical care for the detainees and inmates in the Augusta-Richmond County Jail for a

fee, and sought to do so by providing employees and contractors who were to provide medical care consistent with the law. ("Def. Correct Care")

7.      Upon information and belief Def. Correct Care just joined with Correctional Medial Group Companies, several months ago, so Plaintiff is without sufficient information to be any more particular than that, and the information to properly name the parties is particularly within the knowledge of Defendant Correct Care or Correctional Medial Group Companies.

8.      Correct Care Solutions, LLC, may not be the appropriate name of the entity that owns or controls the employees and contractors who provided medical care to the inmates and detainees at the Augusta Richmond County Jail during the period of 2016 to the present under an agreement or contract with the County, but to the extent another named entity or successor provided medical care for detainees and inmates in the Augusta Richmond County Jail at the material time of Plaintiff's incarceration in early 2017, it is Plaintiff's intent to sue the company or persons who owned the business that had the contract or agreement with the County to provide medical care for the detainees and inmates of the Augusta Richmond County Jail during the period of early 2017 pursuant to the County's non-delegable duty to  provide medical care.

9.      In addition to doing business at the Charles B. Webster Detention Center in Augusta, Correct Care Solutions, LLC also does business within the State of Georgia at 2985 Gordy Parkway, 1st Floor, Marietta, GA 30066, and the registered agent for purposes of service, Correct Care Solutions, LLC, according to the Georgia Secretary of State website on November 20, 2018, is Corporate Creations Network Inc., with a physical address of 2985 Gordy Parkway, 1st Floor, Marietta, GA 30066.

10.     In the state claims against Defendant Correct Care Solutions, LLC, alleging medical malpractice, it is sued based on vicarious liability for the negligent actions and refusals to act of

its agents, who were under a duty to provide medical care to inmates and detainees of the

Augusta-Richmond County jail consistent with the professional standard of care of profession as

physicians, nurses, licensed practical nurses or other titled professional, or the profession

generally under the circumstances.

11.     In the federal claims, the Defendants Correct Care and its policymakers in their official

capacity, whether Dr. Rogers, any John or Jane Doe doctor, Dr. Jane Doe African American

Doctor (or Nurse), Jane and John Doe medical or administrative policymakers whose true names,

title and number are not known, but who may be titled Regional Manager, Health Services

Administrator, Clinical Coordinator, Director of Nursing, Assistant Director of Nursing and

Mental Health Director, are sued for action and inaction taken under color of law as

policymakers, for creating polices or leaving in place customs and practices that reflect actual or

constructive notice of Lee's need for the treatment of the serious medical needs of diabetes, heart

conditions, and anxiety and panic attacks, and then with indifference to that need for withholding

and not providing the prescribed or needed medical treatment, placed Lee at a substantial risk of

serious harm.

12.     Defendants jointly and in combination and conspiracy engaged in delay and failure to

provide Lee the prescribed medication day-after-day, causing a continuing injury, during his stay

at the Charles B. Webster Detention Center from January 10, 2017 to February 6, 2017, that has

caused Lee adverse long term, adverse physical consequences and emotional suffering.

13.      In the federal claims against Defendant Correct Care Solutions, LLC, it is sued for the

prolonged, repeated acts of medical negligence and gross negligence amounting to deliberate

indifference to serious medical need by its agents, employees and contractors, amounting to a

custom, practice, or policy infused with and causing deliberate indifference to Lee's serious

medical need, causing substantial risk and injury to Plaintiff and other detainees and inmates beginning in at least 2016, and continuing forward through to the present.

14.     Additionally, in the federal claims, against Dr. Rogers, any John of Jane Doe doctor, Dr. Jane Doe African American Doctor (or Nurse), Jane and John Doe medical or administrative policymakers whose true names, and number are not known, but who may be titled Regional Manager, Health Services Administrator, Clinical Coordinator, Director of Nursing, Assistant Director of Nursing and Mental Health Director, and other unknown titles, are sued in their individual capacities for action and inaction taken under color of law, that while having actual or constructive notice of Lee's need for the treatment of objectively serious medical needs of diabetes, heart conditions and anxiety and panic attacks, individually or jointly one or more withheld medication they knew or should have known to have been prescribed, because they obtained a list of the medications Lee was prescribed and had been getting from his pharmacy with his consent several days within the admission,  for the dual purposes of  assessing the cost of such medication consistent with Def. Correct Care's custom, practice and policy of not providing expensive medication or treatment without sound medical basis or approval of a treating physician or the detainee's consent) and they knew or can be found to have known, that he failure to provide prescribed or adequate medication would put Lee in a condition of being at a substantial risk of harm, and by their indifference to that substantial risk, they did it anyway, individually and pursuant to the policy of indifference, driven by cost.

15.     Because Defendants Augusta-Richmond County, Sheriff Roundtree, individually and in his official capacity, the unknown Chief Jailer or Administrator, individually and in his official capacity, and Major Doe, individually and in his official capacity, had an agent providing the medical care to fulfill the County's duty to provide medical care, these Defendants could not fail

to investigate information that it was possible that medical care was not being adequately provided, where failure to investigate, and if necessary, correct in a timely manner, was to place any detainee who had complained about the medical care at a substantial risk of harm, until the medical concern was address by County related Defendants or Def. Correct Care, where repeated absence of investigation or failure to provide adequate care amounts to a custom or policy of deliberate indifference, and placed Lee at a substantial risk of harm, where Lee had verbally and daily complained to Def. Correct Care personnel, and through the formal computer complaint kiosk to the Sheriff, the Jail Administrator and the Major Doe on at least on two occasions.

16.     All Defendants engaged in delay and failure to provide Lee the prescribed medication, especially as to the expensive prescribed medication for anxiety attacks, day-after-day, causing a continuing injury, during his stay at the Charles B. Webster Detention Center, from January 10, 2017 to February 6, 2017, that caused Lee adverse emotional and physical consequences at the time of his incarceration, that continue today, and that will with reasonable certainty continue into the future.

17.     Defendant Correct Care Solutions, LLC is sued individually and jointly, and for actions taken in conspiracy with one or more of the Defendant officers individually and/or in their official capacity, under color of law, including Sheriff Roundtree, Chief Jailer and Major Doe.

18.     At the material time of January 10 through February 6, 2017, upon information and belief Defendant Dr. Rogers, any John of Jane Doe doctor, Dr. Jane Doe African American Doctor (or Nurse), Jane and John Doe medical or administrative policymakers whose true names, and number are not known, but who may be titled Regional Manager, Health Services Administrator, Clinical Coordinator, Director of Nursing, Assistant Director of Nursing and Mental Health Director, and other unknown titles, and Nurse Sapp, worked as employees of, or contractors for

8

or agents of Correct Care Solutions, LLC., and each is sued in his individual and official capacities, including as a policymaker and individually as a supervisor, for action and inaction taken under color of law in causing the deprivation of one or more federal rights of Plaintiff Lee, and for actions taken in conspiracy with one or more persons individually and/or in their official capacity, and for medical malpractice under state law.

19.     Defendant John or Jane Doe supervisor(s)/administrator(s) whose true identity, number and title are not known to Plaintiff, but whose identity and title are known to Defendant Correct Care Solutions, LLC, and their agents, and who were responsible for supervising subordinate medical personnel, and for making medical decisions about detainees, who played a role in causing or implementing customs, policies or practices, whereby expensive medications and treatments are denied to detainees and inmates like Plaintiff, and others similarly situated who need medication or treatments that are expensive or that have been prescribed, but that one or more of the Correct Care Defendants has decided will not be provided; or in the alternative, the named individual Defendants may be refusing or failing to provide medication that should have been provided, under orders of their supervisors.

20.     Plaintiff sues the Doe supervisors for action taken under color of law in their individual capacity, except as to those supervisors who in their official capacities, de facto or de jure, functionally or by title, alone or in conjunction with others, became final policy makers about the provision of medical care or treatment, driven by cost versus medical need.

21.     Based on the experience of other lawyers in prior litigation with Defendant Correct Care and information they have learned in litigation, the titles of person, who are not doctors, who by policy, practice and custom, were allowed by Def. Correct Care to make decisions that are cost-driven and not consistent with doctor's orders or medical need, causing the withholding of

prescribed and/or expensive medical treatment that created a substantial risk of serious medical

harm to persons detained like Lee, who had been prescribed medication or treatment that was

expensive, during 2016 and into the present, who are not doctors and who have titles like:

Regional Manager (generally not on site), Health Services Administrator, Clinical Coordinator,

DON or Director of Nursing, Assistant Director of Nursing, and Mental Health Director, and

other titles not yet known.

22.    The names, identity and number of the supervisors referred to in the paragraph

immediately above are not known to Plaintiff, but are known the Defendants.

23.    Plaintiff believes Defendant Nurse Sapp,  with a Jamaican accent, is a nurse who worked

as an employee of, or contractor for Correct Care Solutions, LLC., who is sued for medical

malpractice under state law, and for action and inaction taken under color of law in causing the

deprivation of one or more federal rights of Plaintiff Lee in an individual capacity, and for

actions taken in conspiracy with one or more persons individually, and/or in her official capacity.

24.    Defendant Alisha Turvey, LPN, (Def. Turvey), is an LPN who worked as an employee

of, or contractor for Correct Care Solutions, LLC., who is sued for medical malpractice under

state law, and for action and inaction taken under color of law in causing the deprivation of one

or more federal rights of Plaintiff Lee in an individual capacity, and for actions taken in

conspiracy with one or more persons individually, and/or in her official capacity.

25.    Defendant Bevelyn Coping, (Def. Coping) is an employee of, or contractor for Correct

Care Solutions, LLC.  Def., who is sued for medical malpractice under state law, and for action

and inaction taken under color of law in causing the deprivation of one or more federal rights of

Plaintiff Lee in an individual capacity, and for actions taken in conspiracy with one or more

persons individually, and/or in her official capacity.

26.     Defendant Chenise Turman, RN is a Nurse who worked as an employee of or contractor for Def. Correct Care Solutions, LLC., who is sued for medical malpractice under state law, and for action and inaction taken under color of law in causing the deprivation of one or more federal rights of Plaintiff Lee in an individual capacity, and for actions taken in conspiracy with one or more persons individually, and/or in her official capacity.

27.     Defendant Cynthia Witcher, is an LPN, who worked as an employee of or contractor for Def. Correct Care Solutions, LLC., who is sued for medical malpractice under state law, and for action and inaction taken under color of law in causing the deprivation of one or more federal rights of Plaintiff Lee in an individual capacity, and for actions taken in conspiracy with one or more persons individually, and/or in her official capacity.

28.     Defendant Eunice Lowe, who worked as an employee of or contractor for Def. Correct Care Solutions, LLC., who is sued for medical malpractice under state law, and for action and inaction taken under color of law in causing the deprivation of one or more federal rights of Plaintiff Lee in an individual capacity, and for actions taken in conspiracy with one or more persons individually, and/or in her official capacity.

29.     Defendant Jerio Wallace, RN, who worked as an employee of or contractor for Def. Correct Care Solutions, LLC., who is sued for medical malpractice under state law, and for action and inaction taken under color of law in causing the deprivation of one or more federal rights of Plaintiff Lee in an individual capacity, and for actions taken in conspiracy with one or more persons individually, and/or in her official capacity..

30.     Defendant Kimberly Cunningham, RN, who worked as an employee of or contractor for Def. Correct Care Solutions, LLC., who is sued for medical malpractice under state law, and for action and inaction taken under color of law in causing the deprivation of one or more federal

rights of Plaintiff Lee in an individual capacity, and for actions taken in conspiracy with one or more persons individually, and/or in her official capacity.

31.     Defendant Kenya Ervin, LPN who worked as an employee of or contractor for Def. Correct Care Solutions, LLC., who is sued for medical malpractice under state law, and for action and inaction taken under color of law in causing the deprivation of one or more federal rights of Plaintiff Lee in an individual capacity, and for actions taken in conspiracy with one or more persons individually, and/or in her official capacity.

32.     Defendant Kaydeen Porter LPN who worked as an employee of or contractor for Def. Correct Care Solutions, LLC., who is sued for medical malpractice under state law, and for action and inaction taken under color of law in causing the deprivation of one or more federal rights of Plaintiff Lee in an individual capacity, and for actions taken in conspiracy with one or more persons individually, and/or in her official capacity.

33.     Defendant Patricia White who worked as an employee of or contractor for Def. Correct Care Solutions, LLC., who is sued for medical malpractice under state law, and for action and inaction taken under color of law in causing the deprivation of one or more federal rights of Plaintiff Lee in an individual capacity, and for actions taken in conspiracy with one or more persons individually, and/or in her official capacity.

34.     Defendant Rochelle Larry LPN, who worked as an employee of or contractor for Def. Correct Care Solutions, LLC who is sued for medical malpractice under state law, and for action and inaction taken under color of law in causing the deprivation of one or more federal rights of Plaintiff Lee in an individual capacity, and for actions taken in conspiracy with one or more persons individually, and/or in her official capacity.

35.     Defendant Shedericka Edwards who worked as an employee of or contractor for Def. Correct Care Solutions, LLC., who is sued for medical malpractice under state law, and for action and inaction taken under color of law in causing the deprivation of one or more federal rights of Plaintiff Lee in an individual capacity, and for actions taken in conspiracy with one or more persons individually, and/or in her official capacity.

36.     Defendant Teresa Leslie who worked as an employee of or contractor for Def. Correct Care Solutions, LLC., who is sued for medical malpractice under state law, and for action and inaction taken under color of law in causing the deprivation of one or more federal rights of Plaintiff Lee in an individual capacity, and for actions taken in conspiracy with one or more persons individually, and/or in her official capacity.

37.     Defendant Willie Baldwin who worked as an employee of or contractor for Def. Correct Care Solutions, LLC., who is sued for medical malpractice under state law, and for action and inaction taken under color of law in causing the deprivation of one or more federal rights of Plaintiff Lee in an individual capacity, and for actions taken in conspiracy with one or more persons individually, and/or in her official capacity.

38.     Defendant Augusta-Richmond County is sued for failing in its duty to provide medical treatment that is not inhumane and for having policies practices and customs of a delivery of medicine and medical care by its agent that are deliberately indifferent to the serious medical needs of the detainees and inmates such as Plaintiff Lee during the period 2016 to present when Correct Care Solutions was providing medical care.

39.     Defendant Augusta-Richmond County is sued through its mayor Hardy Davis in his official capacity and the sheriff Richard Rountree in his official capacity for the deliberately

indifferent medical care provided to detainees and inmates, like Plaintiff, during the period 2016 to present when Correct Care Solutions was providing medical care.

40.     Defendant Augusta Richmond County Sheriff Richard Rountree i**s** sued in his individual and official capacity, and for actions and inactions taken under color of law as a policymaker in the area of supervisor over the jail's medical care on behalf of the County and its duty to provide medical care, as contracted through Def. Correct Care, where he knew or should have known was deliberately indifferent to a known serious medical risk, had he not been engaged in deliberately indifferent investigation of notice of possible problems with adequate medical care, failing in the County's duty to provide adequate medical care, during the period 2016 to present when Correct Care Solutions was providing medical care.

41.     Defendant Chief Jailer or Jail Administrator, whose name and number are not presently known to Plaintiff, who was to respond to grievances about inadequate medical care, i**s** sued in his individual and official capacity, and for actions and inactions taken under color of law as a policymaker in the area of supervisor over the jail's medical care on behalf of the County and its duty to provide medical care, as contracted through Def. Correct Care, where he knew or should have known was deliberately indifferent to a known serious medical risk, had he not been engaged in deliberately indifferent investigation of notice of possible problems with adequate medical care, failing in the County's duty to provide adequate medical care, during the period 2016 to present when Correct Care Solutions was providing medical care.

42.     Major Doe, whose name and number are not presently known to Plaintiff, who held position as the official with the Sheriff's Department who was to respond to grievances about inadequate medical care, i**s** sued in his individual and official capacity, and for actions and inactions taken under color of law as a policymaker in the area of supervisor over the jail's

14

medical care on behalf of the County and its duty to provide medical care, as contracted through Def. Correct Care, where he knew or should have known was deliberately indifferent to a known serious medical risk, had he not been engaged in deliberately indifferent investigation of notice of possible problems with adequate medical care, failing in the County's duty to provide adequate medical care, during the period 2016 to present when Correct Care Solutions was providing medical care.

43.     All Defendants are sued individually and jointly, and for acting in conspiracy with one another.

Facts

John Lee

44.      In 1998, when Mr. Lee was 35, he had serious cholesterol and hypertension issues that caused two heart attacks in one day, and as a result had to have triple bypass surgery.

45.     Mr. Lee also had diabetes.

46.     After surviving the heart attacks, about six months later, he started having panic and anxiety attacks.

47.     Plaintiff's panic attacks can occur at any time, and pain can be in any part of the body, but most likely, in descending order, occur in the chest, head, leg, foot, and then randomly in other parts of his body.

48.     After Lee's physicians prescribed medication to take as needed for panic attacks, he would still get panic attacks at 11-12:00 pm almost every night, but when he would feel a panic attack coming, he would take the medication, and it would usually control it within an hour.

49.     Since then he has sought out good medical care and has made informed medical decisions to maintain his health and bodily integrity.

50.     Although, Mr. Lee continued to have Type 2 diabetes, hyperglycemia or high blood sugar levels because his body does not make enough insulin, problems with cholesterol or hyperlipidemia, atherosclerotic heart disease or hardening of the arteries, anxiety disorder and panic attacks, all of these serious medical conditions were manageable and under control, until the mistreatment complained of herein in early January 2017 at the hands of the Defendants.

51.     These conditions were manageable because Mr. Lee was able to follow the orders of his doctor of choice since about 2013, Dr. Zhang of Augusta.

52.     Mr. Lee has taken the medication she has prescribed, which has enabled him to preserve and protect his bodily integrity, minimize the impact of anxiety and panic attacks, the associated perceived physical pain, to avoid needless pain and to live a productive life.

53.     Dr. Zhang required Mr. Lee to have checkups every three months and she has prescribed ten medications that Lee chooses to take in order to protect his health and ability to provide for himself.

54.     In December 2016 through February 2017, Mr. Lee had been prescribed the following medications by Dr. Zhang, that he bought and was taking until jailed:

     a.   Lisinopril - for heart, 10 MG  1 x day, $40-50 month.

     b.   Metformin - diabetes, 1000 MG 2 x day, $45 a month.

     c.   Glimepiride – diabetes, 4 MG 2 tabs 1 x day with breakfast, first main meal, $25 per month.

     d.   Buspirone – anxiety, 15 MG 1 tab 2 x day, $35 per month.

     e.   Fenofibrate – heart, triglyceride and cholesterol, 160 MG 1 x day, $75 month.

     f.   Pioglitazone – diabetes, none, prescribed 45 MG 1 x day, $50 per month.

g.   Lorazepam – anxiety, 1 MG 1 tab daily as needed for panic, $9.00 for 90 pills (Schedule II narcotic.

h.   Atenolol – heart, control and helps reduce blood pressure, 100 MG 1 x day, $25-month supply.

i.   Zetia – cholesterol/heart, 10 MG, 1 x day, $400/30 days.

j.   Januvia – diabetes, 100 MG 1 x day, $500 per month.

k.   Aspirin – delayed release 81 MG 1 x day.

55.   Because Lee's health conditions make insurance very expensive, he chooses to pay for his own medication, and he pays about $1200 per month.

56.   In January 2017 Mr. Lee's diabetes and blood sugar levels were well regulated by medication and Mr. Lee did not have to inject insulin, and therefore he did not suffer pain of insulin injections repeated several times a day.

57.   Mr. Lee makes his living buying, renovating, renting, selling and financing real estate.

58.   In November 2016, Augusta-Richmond County Code Enforcement Inspectors told him they were condemning certain property, and he told them that he had sold that property.

59.   In early January 2017, the Code Inspectors issued Lee three citations for ordinance violations, in part in connection with the disputed property.

60.   All three citations were to be tried in the Magistrate Court of Augusta-Richmond County.

61.   One had an appearance date of January 10, 2017, and the other two, February 2, 2017, early in the morning.

62.   Prior to January 10, 2017, Mr. Lee was not provided any notice by Defendants that he should pre-arrange with the Sheriff's Department of Augusta-Richmond County to have a supply of medications that; should he be jailed, could be given to the Sheriff's Department and that any

medical provider could then provide, so his treatment while in jail would not be in deliberate indifference to Dr. Zhang's orders and Mr. Lee's serious medical needs, whether the need was a physical problem, or the anguish and apparent physical pain caused by an anxiety attack.

63.     Even if Lee had been given such notice, and even if he had tried before going to court to make arrangements with the Sheriff's Department to continue his chosen, prescribed and needed medical treatment, the Sheriff individually and in his official capacity, the County and the medical provider, Def. Correct Care have a policy of precluding such a continuation of medication prescribed by a treating physician, where with reasonable accommodation, that could be arranged.

64.     Before going to Court on January 10, Mr. Lee prepared to defend the charges about the property by bringing the security deed, showing that effective November, another person owned the property.

65.     During the January 10, 2017 proceedings in Magistrate Court, to Mr. Lee's surprise all three citations were tried by the Magistrate.

66.     A Magistrate originally sentenced him to 8 months confinement.

67.     Mr. Lee was taken into custody in the Magistrate Court, and put in a holding cell just outside of the courtroom, and from there he was taken to the Augusta-Richmond County Jail, Charles B. Webster Detention Center, Phinizy Rd., Augusta, GA.

68.     By housing Mr. Lee in the County jail, the County through its facility, agents and the Sheriff's Department employees, had a duty to provide medical care that was not inhumane or oppressive under state law.

69.    Mr. Lee did not have any of his medications with him when he went to the jail on January 10, 2017, and he was not allowed to make any phone calls to make arrangements to provide medication.

Medical Intake

70.    When he arrived at the jail in the evening, he went into a cubicle with a nurse who questioned him about his medical conditions, medication, doctor and pharmacy.

71.    Mr. Lee informed her that for many years he was treated by Dr. Zhang, that in 1998 he had two heart attacks, a triple bypass, diabetes and anxiety and panic attacks and said he took about ten medications.

72.    Because he had not any medication since the morning, he was feeling light-headed and could not name all, but that he got all of his medication at Costco.

73.    Mr. Lee believes he signed a medical release to allow agents of Correct Care Solutions to contact Dr. Zhang to verify the medications that the doctor had prescribed for Mr. Lee.

74.    Mr. Lee did sign a release which allowed the agents of Correct Care Solutions to contact the Costco pharmacy, where Mr. Lee purchased his medication, which would have provided a list of the medications, dosage and likely the name of the prescribing physician.

75.    The medication he had been prescribed and was taking is listed below; and it also states the problem treated, cost, and whether he received the medication during his stay in the jail, and in some instances, and how much he was prescribed, versus what he received while in the care of Defendants.

      a.    Lisinopril - for heart, not expensive, $40-50 month, given none.

      b.    Metformin - diabetes, $45 a month, received about a quarter of the prescribed dosage.

    c.   Glimepiride – diabetes, $25 per month, given once a day.

    d.   Buspirone – anxiety, prescribed 15 MG 1 tab 2 x day, $35 per month, given none.

    e.   Fenofibrate – heart, triglyceride and cholesterol, $75 month, given none.

    f.   Pioglitazone – diabetes, $50 per month, given none.

    g.   Lorazepam – anxiety, as needed for anxiety attack, $9.00 for 90 pills (Schedule II narcotic), given none.

    h.   Atenolol – heart, given, $25 month, given.

    i.   Zetia – cholesterol/heart, $400 for 30 days, given none.

    j.   Januvia – diabetes, $500 per month, given none.

76.    On January 10 a nurse tested Plaintiff's blood sugar level, and it was over 200, so she gave him an injection of insulin, and he never injected insulin and had prescribed medication.

77.    He received none of his prescribed medication that day.

78.    A day or two later Mr. Lee was taken to a meeting with the nurse who was African-American, light-skinned, heavy set, and around 5'8" tall.

79.    An officer was present.

80.    Mr. Lee could see that the nurse had a list of medications from Costco, which is the pharmacy where he purchased his medication.

81.    The nurse asked Mr. Lee if he had insurance, to which Mr. Lee replied, "No."

82.    The nurse asked if he had Medicaid, to which Mr. Lee replied, "No."

83.    Mr. Lee told her that he paid for his medication.

84.    Mr. Lee told her that he can't afford health insurance and pay for his medication.

85.    The nurse told him that they could not give him most of the medications, because it was too expensive.

86.     To Mr. Lee's knowledge no one on behalf of the Defendants ever contacted his doctor to discuss what medication Lee should continue or discontinue, and based on what his doctor has said, no one from the Sheriff's office or Correct Care contact her.

87.     On about the third day, a small group of inmates were taken to a room to do a TB test.

88.     The TB test was being done by a small light skinned African American woman, probably in her sixties, when the TB test was being done, an African American woman, about six feet tall, wearing a long white coat like a doctor, who may have been a doctor or nurse, who is identified herein as Jane Doe African American Doctor or Nurse, Plaintiff complained to her about the fact that he was not getting the medication prescribed by his doctor, and he mentioned the fact that he was not getting anything for the anxiety attacks and that he was getting no sleep at nights and all she did was to say, "I'll look into it."

89.     On the second or third day in jail, an African American with a Jamaican accent, who Plaintiff believes to be Nurse Sapp, interviewed Plaintiff as part of sick call or some other medical meeting

90.     Plaintiff told her that he was not getting any of his medication for anxiety and panic attacks, that he had one each night and was in pain and felt like his chest was being crushed or his head was being crushed and that he got no sleep, so he asked for medication for anxiety and panic attacks.

91.     Nurse Sapp told him. "It's just all in [his] mind."

92.     Plaintiff had two or three other meetings with Nurse Sapp during his time in the jail, and again he told her about the nighttime anxiety attacks, the pain and the sleepless nights, and he requested the anxiety medication again, and again, with deliberate indifference, to his serious

medical need of being made to suffer prolonged repetitive needless pain, Nurse Sapp said, "It's all just in your mind."

93.     She gave him nothing for the anxiety attacks, and never followed through on his complaints about getting medication for the anxiety and panic attacks by contacting a doctor, or if she did talk to the doctor, the doctor never addressed it, and by not providing the medication for the anxiety and panic attacks and the pain associated therewith, she was implementing and following the Def. Correct Care policy of deliberate indifference to serious medical needs, especially indifference to complaints of pain, so long as withholding the medication would not create an obvious, physical emergency condition requiring hospitalization, and it appeared on the surface to only the pain, something Nurse Sapp would say it was just in your head.

94.     In some of Mr. Lee's later meetings with Nurse Sapp, he told her that he was having blood sugar readings well above 300, and that had never happened before, and he sought his prescribed medication for diabetes, but that was never provided.

95.     After about four or five days in jail, they started giving him the following medication:

    a.  Metformin - diabetes, $45 a month, received about a quarter of the prescribed dosage.

    b.  Glimepiride – diabetes, $25 per month, given once a day.

    c.  Atenolol – heart, $25 month, given.

96.     During his stay various Jane Doe nurses would check his blood sugar three times a day.

97.     When his blood sugar level was over 200, the nurse would give him an injection with insulin, which occurred two to three times a day.

98.     When the nurse would take his blood sugar reading Mr. Lee would observe the reading, or she would announce the reading, and sometimes it was as high as 400.

99.     In each of the meetings with the nurses checking his blood sugar Mr. Lee would request his prescribed medication for diabetes and anxiety and panic attacks.

100.    Some of the nurses would say they only dealt with the diabetes and insulin would not promise to say anything to anyone and others would say they would tell the doctor, or say they would see what they could do.

101.    There was never any change, and Mr. Lee did not get his prescribed medication for diabetes, nor did he get any treatment for anxiety and panic attacks that were accompanied by pains in his chest and labored breathing or crushing head pain and at other times other parts of his body.

102.    After he was released from the jail in early February 2017, Mr. Lee continued to suffer injury from the deliberately indifferent treatment for his diabetes, , because his blood sugar levels remained high for two months thereafter, and they have yet to be consistently in the range he had before he went to jail and was deprived of his prescribed medication without justifiable medical need and injected with insulin.

103.    Mr. Lee's A1c reading in October 2016 was 6.7, where glycemic control for adults is 7 or lower.

104.    Higher ratings can cause eye, kidney and nerve disease.

105.    Historically before December 2016 his blood sugar levels were under control.

106.    When Mr. Lee was released from jail on February 6, he began taking the 10 medications previously prescribed by Dr. Zhang.

107.    When Mr. Lee went to Dr. Zhang on February 28, 2017, his A1c reading was 8, which indicates it was not under control.

108.    It was not until June 2018, that it was 7.2, in December 2018 it was 8.4.

109.    The stress, pain, and having injections of insulin during the month at the jail will likely to have an adverse effect on Mr. Lee's health the rest of his life.

110.    Before coming to jail, Lee never had to inject insulin.

111.    Mr. Lee was injected with insulin throughout his jail stay, but if he had been given his prescribed medications he would not have had to be injected with the medication.

112.    Because Mr. Lee was getting no medication for panic attacks, when one would start at around 11-12:00 pm, it would last all night long, instead of the hour or so when he was able to take the medication prescribed by his doctor for treatment of the panic attacks.

113.    Inmates like Plaintiff were locked down in their cells at 10:30 pm at night and so Plaintiff could only try to get the guard's attention, and even when a guard would see Mr. Lee sitting on the side of bed holding his head throughout the night and we would request help, the guard would do nothing.

114.    Because he was having panic attacks all night, he was sleep deprived.

115.    In the morning, a few of the Jane Doe nurses who would come by for the blood sugar tests, and likely insulin injection, would ask why he was holding his head or his chest, and he would tell them he had a panic attack all night and that he needed his medication to stop the panic attacks.

116.    Even if a nurse would not ask, every day, three time a day Plaintiff would tell the Jane Doe nurses who came to do a blood test and likely insulin injection, that he was having panic attacks every night not able to sleep, and that he needed his medication to stop the panic attacks.

117.    The nurse would respond that she doesn't have anything to do with the panic attack medication and that she had been instructed to do the medication for diabetes.

118.    Plaintiff would ask every nurse to tell the Doctor, and some said they would, but in the four weeks at the jail the Defendants never gave any of the anxiety medication prescribed by Plaintiff's physician to treat the panic attacks.

119.    Each day he would be sleep deprived, and along with the diabetes that was out of control, he would not have been competent to do business dealings.

120.    During this period in the jail, he was taken back to Magistrate Court one or more times, and he remembers little of what happened in these other hearings.

121.    One of the younger inmates or detainees, told Mr. Lee he looked bad.

122.    The younger person told Mr. Lee about making a complaint about not getting medication, by using the computer grievance kiosk to lodge a complaint that was supposed to go to the Major Doe or the Chief Jailer or Jail Administrator.

123.    It is Plaintiff's understanding that the Defendant Major Doe or the Chief Jailer or Jail Administrator was to review the grievances and complaints made by inmates and detainees through the computer grievance kiosk, and then get back with the person who sent the grievance or complaint about what action would be taken to clear up the problem.

124.    During his incarceration Mr. Lee filed two or more formal complaints through the computer kiosk about not getting adequate medication, to which he received no response, and there was no change in the ongoing denial of the needed medication.

125.     Among the medications that were never provided was the medication for the anxiety attacks, which nightly caused him to suffer not only the anxiety, but the related breathing difficulty accompanied by a feeling that he had a heavy weight on his chest.

126.    The prolonged experience of not getting sufficient sleep, elevated levels of blood sugar, and the needless and sever pain from panic attacks have caused Mr. Lee to suffer mental anguish

in the form of PTSD, and when a memory his mistreatment is trigged, he will re-live the stress and anxiety he suffered while in jail.

127.    In particular, when Mr. Lee must visit Augusta for business now, from his North Augusta residence, he usually gets diarrhea, which makes it difficult to do his real estate work.

128.    It occurs when has come to Augusta for a social event.

129.    He has had to buy and keep Imodium, which he did not need before.

130.    Sometimes he has had to return home to address the stress related problem, interfering with his work or a meeting.

131.    Mr. Lee will with reasonable certainty continue to suffer stress and anxiety, and physical symptoms caused by the Defendants deliberate indifference to his objective serious medical needs. , of which the Defendants knew by actual and/or constructive knowledge, including the fact that they had a list of medications that he had been prescribed and that they had obtained from the Costco pharmacy, and by the fact that one of more of the policymaker Defendant Correct Care Solutions gave orders to front line nurses not to provide medications that were expensive or those that were for prescribed for pain.

132.    At no time did a physician or nurse with Correct Care Solutions talk to or communicate with Mr. Lee's physician, Dr. Zhang, about Lee's condition or medication.

133.    At no time did any agent of Correct Care Solutions get the approval of Dr. Zhang or Plaintiff to take Plaintiff off the medication for treatment of anxiety or panic attacks that had prescribed by Dr. Zhang.

134.    Mr. Rhodes continues to earn a living buying, renovating and selling and financing real estate, including in Richmond County.

135.    On occasion he will rent to tenants and then sell the property.

136.     Some of the properties he will rent or sell are properties that are likely to be the subject of

a Code Enforcement action, even through no fault of his own, and that could result in an

ordinance violation charge, and the prospect of conviction and being sentenced to jail in the

Augusta-Richmond County Jail, where it is likely that the same deliberately indifferent polices

and practices will be in effect,  and a stay there would result in irreparable harm and the

constitutional deprivation of rights by being placed at substantial risk of serious harm by

deliberate indifference to serious medical needs, by providing medication that is in different to

needs for a parent or perceived pain, so long as the withholding of the medication does not

create an emergent physical situation or the physical condition is internal that is causing the

pain yet not obvious to the lay observer externally, such that even guards in jail officers would

know the person needed emergency medical care.

Roscoe Rhodes

137.     As of November 2016, Roscoe Rhodes was 60 years old, and since 2001 he has been in

the medical care of Dr. James K. Smith, Pulmonary Chief, at the Charlie Norwood VA in

Augusta.

138.     Dr. Smith has been treating Rhodes for asthma, and other physicians at the VA treat

Rhodes' hypertension and deep vein thrombosis.

139.     Prior to 2001 Rhodes was hospitalized at least once a year for a lung related issue, but

since Rhodes began seeing Dr. Smith in 2001, Rhodes has had few hospitalizations related to

asthma, and his lung functioning has remained fairly steady, subject to some age-related

diminution.

140.     During this period, he has been subjected to relatively objective tests that measure lung

function capacity.

141.    On November 18, 2016, Mr. Rhodes was incarcerated at Charles B. Webster Detention Center, in Augusta, for failure to appear on a DUI charge

142.    Rhodes' serious medical conditions of asthma, hypertension and diabetes were under control in November 2016 when he entered the Augusta-Richmond County jail.

143.    According to the records there was an extensive intake health screening in which an agent of Defendant Correct Care who read it or should have read the screening, would have been aware of Rhodes' serious medical conditions, including the need for expensive breathing treatments 2-4 times daily, along with the need for some medication, that he had been prescribed, and that if he did not get would put Rhodes at serious risk of substantial harm.

144.    At intake Mr. Rhodes was examined by an agent of Correct Care Solutions, the medical contractor for the Detention Center, about his condition and prescribed medications.

145.    From the very outset of his incarceration there was a material difference between what Mr. Rhodes was taking and doing at home for his asthma as ordered by Dr. Smith as to the breathing treatments, versus what was provided by the jail.

146.    Mr. Rhodes believes that on November 18, 2016 he would have told the intake personnel about the following medications.

> Coumadin 5mg
> Albuterol PRN
> Metoprolol (JPB013)

147.    Mr. Rhodes was on several other medications at the time but could not remember them all.

148.    Mr. Rhodes is likely to have informed them that he was doing four lung treatments daily with Ventolin.

149.    On November 21 or 22, 2016, Mrs. Rhodes went to the Detention Center with a box of medications Mr. Rhodes was taking at home.

150.    She met with an agent for Correct Care and went through the box of medications.

151.    Mrs. Rhodes believes there were many more medications than the five on the list that follows.

152.    The agent made a list and gave the box of medications back to Mrs. Rhodes.

153.    The following is from a list on a document received from the institution relating to the meeting with Mrs. Rhodes:

> Omeprazole 20 mg
> Atorvastatin 80 mg
> Symbicort inhaler
> Finasteride 5mg
> Guaifenesin 400

154.    Correct Care started providing the following:

> Coumadin 5mg
> Albuterol PRN
> Metoprolol
> Prednisone

155.    About a week later, Dr. Michael Rogers, with Def. Correct Care, prescribed Mr. Rhodes the following medications as of November 28, 2016, but that does not mean they were provided:

> Coumadin
> Hydrochlorothiazide
> Norvasc
> prednisone
> solumedrol
> albuterol sulfate
> Ventolin HFA

156.    Also, Mr. Rhodes reports that he never received four breathing treatments in a day, some days he got no breathing treatments, and on a good day he got two.

157.    The breathing treatments would have been labor intensive and expensive.

158.    Rhodes and his roommate complained repeatedly to try to get breathing treatments for

Rhodes

159.    On December 21, 2016, Mr. Rhodes was incapacitated in his cell and his cell mate

summoned help.

160.    Some type of resuscitation involving pushing on the chest was provided by the jail, but in

the process they broke a rib, because no such injury is recorded in the subsequent hospital

records.

161.    Mr. Rhodes was taken to University Hospital and he was put in the ICU, where he

required CPR resuscitation and mechanical ventilation on December 21, 2016.

162.    He was released from the hospital on December 31, 2016.

163.    A few weeks later he went to the VA and Dr. Smith noted that Rhodes suffered a

substantial and permanent worsening of his lung functioning, reporting a reduction in lung

volume of 36%.

164.    Dr. Smith noted cognitive issues and referred Mr. Rhodes for neuropsychological testing

by Debra Pierce, Ph.D., who found cognitive problems, which she attributes to atoxia.

165.    Rhodes suffered mental anguish during his time in jail connected to the denial of

breathing treatments, and he will with reasonable certainty continue to suffer mental anguish.

166.    The asthma attack was caused by the medical indifference and negligence caused by

Correct Care Solutions, its agents and policymakers, its practices and customs during the month

of indifferent medical treatment of Rhodes.

167.    Each of Rhodes' medical conditions, asthma, hypertension and deep vein thrombosis

presents a serious medical condition such that if there is undue or material delay in treating these

conditions it poses a substantial risk of serious harm.

168.     Lay persons and jailers with basic medical training for a jailer, and any objective health care provider trained to work in jails or hospitals would know, that if asthma goes untreated without regular mediation and breathing treatment if ordered, that poses a substantial risk of serious of harm of an asthma attack, which is recognized by anyone as sever breathing difficulties.

169.     Any one knows that breathing difficulties can result in a lack of oxygen.

170.     Anyone knows that inadequate oxygen, from breathing difficulties, whether from smothering, drowning, choking or a medical condition, even for a short period, can result in brain damage.

171.     As a matter of custom and practice, there was no verification of the medication that should have been given to Roscoe Rhodes in November and December 2016, defendants herein denied Rhodes access to medication and treatment for his asthma and hyperventilation that had rendered him stable for 19 years, through treatment provided by the VA in Augusta, where his pulmonologist was Dr. Smith, who had successfully managed Rhodes' medical problems.

172.     As a result, after a month in the Augusta-Richmond County Jail and not receiving adequate treatment for his hypertension and asthma, on December 21, 2016, Rhodes developed and exacerbation of asthma/COPD that resulted in permanent anoxic brain injury and diminishment of lung function, and he had to be sent by ambulance to University Hospital, where he was put in the ICU, and he remained in the hospital for a period of 10 days.

173.     Rhodes now has impaired mental functioning, requires the use of portable oxygen and is either wheelchair-bound or requires a walker, requiring personal aid and attention to perform the daily tasks of life.

174.    The Defendants did not provide medication or treatment that was expensive to Mr. Rhodes, because it was more expensive than other medication or treatment, and not because of medical reasons.

175.    Mr. Rhodes' medical records from the jail don't reflect medical reasons why he was not provided with breathing treatments as needed daily, which he had been getting while at home and while under the care of the VA for nearly two decades.

176.    Mr. Rhodes' medical records from the jail are confusing and could be incomplete or reflect care indifferently provided.

177.    Mr. Rhodes has filed an action in the Southern District of Georgia, Augusta Division, case number 1:18-CV-00219-JRH-BKE, against essentially the same Defendants.

Morgan Mizelle

178.    Mr. Mizelle is a 47-year-old man who was arrested on January 4, 2017 for a drug charge in Richmond County, GA.

179.    When being processed into the Charles B. Webster Detention Center jail on January 5, 2017, his weight was recorded at 312 lbs.; Mizelle is just over six feet tall.

180.    On November 2, 2017, the last time his weight was recorded at the jail, just before his release, Mizelle weighed 211 lbs.

181.    He was released on own recognizance on November 18, 2017, because the jail did not want to deal with his medical issues.

182.    On January 5, 2018, he was diagnosed with stage IIB gastric cardia adenocarcinoma (esophageal/stomach cancer).

183.    When he entered the jail he told the medical staff interviewing him that he had been heavy his entire adult life and had been at about that weight for several years.

184.    Prior to his arrest Mr. Mizelle remembers having thrown up 3-4 times during the month of December 2016.

185.    During December he attributed this to not eating healthfully over the holiday season and a history of acid reflux.

186.    He did not visit a doctor about a few instances of vomiting in December.

187.    Although Mr. Mizelle had been having some digestive issues before he was arrested, his symptoms drastically escalated once he got to the jail.

188.    After about a month of being in the jail, he was unable to keep food down without vomiting, causing dramatic weight loss.

189.    The vomiting escalated to the point where he would do so after every meal.

190.    The only food he could keep down was milk and boost energy drinks.

191.    He would take milk and mix it with peanut butter, just to have some protein.

192.    Mr. Mizelle wrote numerous sick calls and grievances about not getting help for the vomiting and weight loss using the computer grievance kiosk.

193.    The Defendant Sheriff and his agents had a policy, custom or practice that if a detainee or inmate submitted more than 2-3 grievances in a week, the officers would lock the person out of access to the computer grievance kiosk.

194.    Mr. Mizelle was "locked out" an average of once a month.

195.    Mr. Mizelle put in sick calls continuously throughout his stay in the jail.

196.    Despite the many grievances and sick call slips Mizelle filed he did not receive any better care.

197.   By March 2107, the records reflect complaints of "unable to digest" and an order by Dr. Rogers for chewable Gaviscon, before each meal and Prilosec, requiring notice if this order is delayed.

198.   So, by March 2017, notice of a serious medical need was recognized, but a minimalistic treatment plan officered and the need for investigation and examination that was not deliberately indifferent was not followed, to save money.

199.   Jail records received form Defendants show a great disparity between the number that they purportedly had, which was 5 sick calls and 2 grievances, pertaining to the vomiting and weight loss during his time at the jail.

200.   He submitted numerous sick calls pertaining to other medical issues as well.

201.   Mr. Mizelle reports not receiving any care after the grievances that was different from the care he received before filing grievances.

202.   His only treatment was being given ibuprofen for his stomach pain which was a constant pressure, and eventually being put on a "boost drinks" diet.

203.   Defendant Correct Care and jail staff gave these meal replacement drinks very inconsistently.

204.   Records from the jail show Mizelle was prescribed an extra strength nausea reliever and acid reflux medicine, but both were administered inconsistently and were ineffective at treating his vomiting and subsequent weight loss.

205.   He was not taken to an outside specialist until November 1, 2017, some eleven months after entering the jail, after throwing up every day, and after already having lost approximately 100 lbs. associated with problems with his digestive system.

206.   He was then taken to a GI clinic, but no evaluations were done and no tests run.

207.    The GI clinic recommended Mr. Mizelle be scheduled for an endoscopy.

208.    Dr. Rogers or another doctor reported they would schedule one, but he was released November 18, 201.

209.    An endoscopy would have been expensive, so the Correct Care Defendants arranged his release through the Defendant Sheriff and his agents.

210.    Because of the deliberate indifference to the obvious need for testing as to the cause of the vomiting every meal, that was causing obvious weight loss, that obviously had to do with a serious problem within or that impacted his digestive system, caused Def. Correct Care's custom of avoiding expensive examination and treatment, the examination was unduly delayed, and the pain, vomiting and weight loss unduly prolonged, putting Mizelle at a substantial risk of harm made to suffer undue pain.

211.    Alternatively, supervisory nurses as the link between Mizell and Dr. Rogers were deliberately indifferent to the fact that testing or examination was obviously needed of, or about his digestive system, and the undue delay in investigating the continual pain, vomiting with every meal and extreme weight loss, was due to their individual indifference as a supervisor to fall in line with perceived Def. Correct Care indifference and cost savings, which Correct Care would deny.

212.    Alternatively, the nurses who dealt with Mizell daily were following the lead of their supervisors, of a real or perceived custom of delay of needed examination when a condition of substantial risk from a cause that could have been readily determined by the next obvious step in examination protocol, and those nurses deliberately ignored that need and did not seek doctor intervention.

213.    Alternatively, Dr. Rogers had been aware of the need for examination of Mizell's digestive system months and months before ordering in November 2017, that Mizell be taken to a specialist to confirm that there was something seriously wrong with his digestive system accompanied by serious weight loss, cancer was an obvious disease for which to examine, where delay in detection and treatment puts the patient at substantial risk of harm.

214.    When Def. Correct Care learned that Mizell needed an endoscopy and that he probably had cancer they arranged his release, rather that begin treatment of a condition that was left to worsen from the time of his admission in January 2017 to his release in November 2017.

Debra Leverett and Lawsuit for her death against Def. Correct Care

216.    Pending in the State Court of Richmond County, Case No. 2017 RCSC00672, Rhett

Black and Daffany Leverett, Administrators, v. Correct Care Solutions, LLC, asserts that the

Plaintiffs' decedent, Debra Leverett died as a result of prolonged medical negligence during the

period March to May 2016, while in the Augusta Richmond County jail.

217.    The prolonged and repeated acts of gross negligence in context of the facts of Debra

Leverett's case amount to deliberate indifference and reckless, heedless conduct.

218.    This Court may take judicial notice of the Third Amended Complaint filed 11/10/2018,

reflecting the poor medical documentation and the allegations of medical negligence.

219.    Prior to the March 2016 incarceration, Ms. Leverett had a longstanding history of

gastrointestinal symptoms that had been attributed to GERD.

220.    For many years, she had taken Nexium, a potent medication that suppresses acid

production.

221.    Her use of Nexium had controlled her symptoms, and abrupt discontinuation of this

medication is prone to causing a rebound in acid production and worsening symptoms.

222.    Facility staff at the Charles B. Webster jail became aware of Debra Leverett's GERD

condition and were advised that she was taking medication for this condition on April 5, when

she reported severe abdominal pain to a nurse.

223.    At that time, she reported a history of GERD and complained of shortness of breath and

pain.

224.    That same day, she was seen for severe abdominal pain.

225.    Contrary to policy, her medications were not verified, and no treatment was started.

226.    Policy dictated that current medications were to be verified and continued as deemed appropriate by the responsible clinician.

227.    On April 11 she was seen by a Nurse Practitioner who wrote that Leverett was reporting "heartburn" and that Leverett took medication for this condition.

228.    She did not document the medications that had been prescribed and did not make arrangements to get her medication records.

229.    A non-prescription antacid was ordered by Correct Care staff.

230.    Ten days later, Leverett was seen by the same nurse who saw her on April 5 and reported additional serious medical issues including diabetes.

231.    Ms. Leverett's medications still had not been verified, but no action was taken to obtain pharmacy records.

232.    Instead of calling the physician for orders for Leverett's serious medical conditions, the nurse placed an order for Ibuprofen, a medication that was unlikely to improve any of her issues and posed a substantial risk of worsening her gastrointestinal symptoms.

233.    As could be expected from the lack of appropriate care, when Leverett was seen six days later, she was reporting severe gastrointestinal symptoms.

234.    But despite the severe symptoms, the Nurse Practitioner for Def. Correct Care completed an insufficient evaluation and ordered medication at a substantially lower dose than Leverett had taken previously.

235.    She was not informed about what symptoms should cause her to seek care and despite severe symptoms, follow-up was not scheduled to occur until 90 days later.

236.    Her reports of hypoglycemia and concerns about her diabetic regimen followed by multiple refusals to take insulin as prescribed should have resulted in evaluation or at least consultation with a provider.

237.    Prior to her incarceration, Leverett had effectively managed her diabetes as evidenced by her hemoglobin Alc level obtained early in the detention.

238.    Hypoglycemia in a 50-year-old diabetic patient is much more dangerous than allowing her sugar to run a bit high.

239.    In light of her report of the need to adjust her dosage, that information should have been reviewed with the clinician.

240.    The failure to adjust her regimen created a substantial risk of harm and contributed to her dehydration, which was listed as one of the causes of death.

241.    Leverett' s gastrointestinal condition did not respond to the treatment Defendant Correct Care provided.

242.    On the evening of April 30, she was seen for a medical emergency.

243.    The nursing pathway for abdominal pain was not completed, which means a reasonably competent nurse should follow to determine the likely ailment designed to eliminate the existence of dangerous conditions, which includes consulting a physician when in doubt.

244.    As a result, crucial information required to determine whether a medical emergency existed was not obtained.

245.     The evaluation was inadequate, and it appears that the nurse who responded to the medical emergency was not properly trained.

246.     Despite abnormal vital signs, the physician was not notified.

247.    The following morning, Leverett was found unresponsive and died soon after.

248.    The actions of Nurse Laura Sanders were egregious and a gross deviation from the standard of care.

249.    She was informed of Debra Leverett's medical issues on two occasions but failed to take action to obtain her pharmacy records or notify the on-call clinician about multiple serious medical conditions.

250.    Leverett also told Sanders that she "can't breathe" but Sanders did not obtain any further history, did not examine Leverett and did not call to obtain medication orders.

251.    Her decision to start treatment with Ibuprofen likely caused or exacerbated Leverett's stomach ulcer.

252.    Sanders first saw Debra Leverett on April 5 when she was informed about the history of GERD and medication for this condition.

253.    According to facility policy, medications were supposed to be verified but there is no indication that she took steps for this to occur.

254.    Ten days later, Nurse Sanders saw Leverett again when she reported additional serious medical issues including diabetes.

255.    Ms. Leverett's medications still had not been verified, but no action was taken to obtain pharmacy records.

256.    Instead of calling the physician for orders, Nurse Sanders placed an order for Ibuprofen, a medication that was unlikely to improve any of her known medical issues and posed a substantial risk of worsening her gastrointestinal symptoms.

257.    Nurse Sanders failed to inquire about her diabetic medication.

258.    The report of a diabetic condition should have led to blood sugar testing and discussion with the responsible clinician to initiate a diabetic treatment plan.

259.    Leverett's blood sugar was not tested and no diabetic treatment was started.

260.    Nurse Sander's note indicates that Leverett told her that she had been taking Neurontin for the diabetic neuropathy.

261.    This medication is effective and widely used for this condition and there are many other effective alternatives.

262.     Ibuprofen is not effective for diabetic neuropathy and should be used with caution in a patient with GERD.

263.    Notification of two additional significant and serious medical needs should have resulted in prompt consultation with the on-call provider.

264.    There is no evidence that this occurred and no testing or treatment for the diabetes occurred until six days later.

265.    Leverett's pharmacy records were finally obtained on April 20.

266.    The pharmacy reported current prescriptions for 14 medications for medical conditions including asthma, diabetes, hypertension, GERD, anemia, constipation, anxiety, diabetic

267.     neuropathy, chronic pam, obesity, and insomnia.

268.    The prolonged delay m completing the medication verification process created a substantial risk of harm and directly contributed to her death.

269.    The medical care provided by Nurse Practitioner Sapp also fell below the applicable standard of care.

270.    Despite multiple responses that identified severe gastrointestinal symptoms, she failed to obtain an adequate medical history necessary to make a specific diagnosis.

271.    The evaluation that she performed was inadequate to assure that Leverett's severe symptoms were not the result of a life-threatening condition and the lab tests that she ordered

were not sufficient to verify that Leverett did not have severe anemia and was not experiencing active gastrointestinal bleeding.

272.    The dosage of Omeprazole that she prescribed represented a significant reduction from her previous dose.

273.    Because of the long-term therapy with Nexium, the severe symptoms, the tendency to develop increased acid production after abrupt cessation, the apparent escalation of symptoms after initiation of Ibuprofen and lack of response to antacids, the medication should have been ordered at least at the prior dose equivalency.

274.    In view of the severe symptoms, Leverett should have been instructed in detail regarding warning symptoms of worsening disease and when to seek care.

275.    In view of the severe symptoms and history of anemia, diagnostic studies should have been ordered and a more timely follow-up should have been scheduled.

276.    The actions of Nurse Leslie not only fell below the standard of care but deprived Debra Leverett of access to appropriate care at the time of her greatest need. Her failure to complete the facility clinical pathway for the evaluation of abdominal pain contributed to an inadequate evaluation by failing to obtain an appropriate history and exam.

277.    The clinical pathway instructed that there should be an immediate evaluation by a health care provider if the pulse exceeded 100.

278.     Leverett's heart rate was well above 100, but no evaluation occurred.

279.    Other information to determine criteria that warranted immediate evaluation per the pathway was not obtained.

280.     The history that was documented was insufficient to determine what condition provoked the emergency call.

281.    The minimal extent of her evaluation suggests that she was not qualified to evaluate Ms. Leverett but there is no indication that she consulted with her supervisor.

282.    Based on the information available at this time, it the expert's opinion that if Debra Leverett had been evaluated by a physician on the evening of April 30, 2016 that her life-threatening condition would have been identified and she would have survived to be discharged from the hospital.

 Angela Owen

283.    Ms. Owen was in the Augusta-Richmond County jail in late fall of 2018.

284.    On the morning of December 8, 2018, she felt an extreme pain in her stomach, like an explosion.

285.    Owen was unable to get out of bed and had her cell mate call for help.

286.    A Correct Care employee listened to her complaints and concluded it was heartburn and gave her two tums and an over the counter antacid.

287.    The Correct Care employee came back to the cell with some paperwork, but Owen could not complete it due to the pain.

288.     Owen asked to be taken to the emergency room, but that request was denied.

289.    The next day she could not walk and had to be taken to the medical area of the jail in a wheelchair.

290.    She was given two Tylenol and Milk of Magnesia and was told the doctor would see her the next day.

291.    The next day, her blood pressure was checked, and the decision was to watch her.

292.    She was put in a bed without a blanket or sheets.

293.    There was no toilet paper, even though they knew she had diarrhea.

294.   Later that day at around 9 p.m. a new employee who Owen had never seen before came to treat her and decided to send Owen to the ER.

295.   Once at the hospital she was rushed into surgery for a gastric perforation.

296.   She was hospitalized for 12 days and given intravenous antibodies throughout her stay.

297.   Ms. Owens has recurring nightmares from the mistreatment at the hands of the Defendants' policies customs and practices.

298.   This court may take judicial notice of the hundreds of lawsuits filed against Correct Care Solution across the country for medical indifference, driven by cost savings decisions without medical basis in good faith, aware of the substantial risk created by the refusal and failure to provide the needed and often previously prescribed medication, and by being deliberately indifferent to complaints of for which there is not an obvious physical cause, by under-medicating for such pain, or not providing medication prescribed by a treating physician for such pain, like from anxiety attacks.

Count I

299.   The Plaintiff incorporates each and every paragraph above as if fully stated herein.

300.   All Defendant sued in Count I are sued for actions taken under color of law.

301.   The Def. County has a non-delegable duty to provide medical care under state law to persons in jail that is not oppressive or inhumane, under the Eighth and Fourteenth amendments that does not place Plaintiff at a substantial risk of harm by deliberate indifference to objective serious medical conditions.

302.   Augusta-Richmond County, or the Sheriff in his official capacity, are sued for the policies and customs of Def. Correct Care that caused deliberate indifference to the serious medical need of Lee to receive medication or already prescribed medication to treat his anxiety

and panic attacks, by failing to provide the already prescribed medication, or for failing to provide any mediation for Lee's anxiety and panic attacks.

303.    The untreated anxiety caused pain in his chest, head, and on occasion other parts of his body, that lasted through the night and prevented him from sleeping at night during his entire stay in the jail, causing sleep deprivation.

304.    The denial of the pain medication and denial of previously prescribed oral medication for diabetes, caused pain and anguish at the time and long term PTSD, that causes Lee, whenever he has to come to Augusta for from his home in North Augusta, to get anxious and have diarrhea, which has changed his life and ability to do whatever business he has in Augusta.

305.    Undue delay in treating pain, or being heedless to pain that can be treated, and the failure to treat psychiatric illness is an objectively serious medical condition.

306.    Failure to follow a doctor's orders, where a treatment has been successful, and where the person has chosen that treatment and doctor, without good medical or penological justification, deprives the person of rights under the First and Fourteenth Amendments.

307.    Before entering jail in early January 2017, Plaintiff had been prescribed medication by his treating physician that had his diabetes under control without the use of insulin injections, and that had his anxiety and panic attacks controllable, without undue pain, prolonged sleep loss nightly, controlling pain in his chest, head and other parts throughout each night that prevented sleep and caused sleep deprivation.

308.    Def. Correct Care nurses who communicated with Lee during the several days intake process was aware that he had anxiety and panic attacks, because he told them.

309.    They also should have known that from the medication list obtained by them with Lee's consent from Costco, his pharmacy.

310.    Def. Correct Care knew that the medication for the anxiety and panic attacks had been prescribed by Lee's physician and that he chose to take it because it worked and prevented needless pain.

311.    Lee received no medication for anxiety and panic attacks during the near month stay in the Augusta-Richmond County jail, even though they knew a doctor had prescribed medication for that condition.

312.    There was never any medical basis asserted by a Doctor for not providing the pain medication.

313.    During the several days intake process, Lee met with a Correct Care nurse who had his list of medications from Costco pharmacy and was told by her that they would not be providing medications that were expensive.

314.    The pain and anxiety medications were expensive.

315.    Def. Correct Care is sued because of their custom and policy of not providing medication or treatment that is expensive, which includes Lee's prescribed pain medication.

316.    Def. Correct Care is sued for their custom of not providing previously prescribed medication without consultation with the doctor who prescribed the medication and without the consent of the detainee or inmate.

317.    Def. Correct Care is sued for their custom of not providing pain medication when it is not for a physical injury.

318.    Alternatively and jointly Nurse Sapp and Jane Doe African American Nurse are sued individually, as a supervisor or as an unsupervised  policy maker, who, made decisions individually, or was allowed by Def. Correct Care intentionally or by indifference as a result of an indifferent  practice of assigning her doctor's authority, about who would get pain medication

and what would be given, and in one or more of those capacities she made the decision to prevent Lee from receiving any of the medication for anxiety and panic attacks, with deliberate indifference to needless, prolonged pain, concluding that his claims of pain were "just in his head," or alternatively she was giving that reason to cover the directives and customs of deliberate indifference of Def. Correct Care, by not providing expensive medication or withholding pain medication where the pain was not associated with a physical, observable, external injury.

319.    Alternatively, Dr. Rogers and Jane Doe African American doctor, are sued individually and jointly for directing or ordering nurses not to provide Lee medication for the anxiety and panic attacks with deliberate indifference to Lee's  known need for that medication by the intake information they had received, the list of medications they had received, and the fact that they would know that a doctor had prescribed the medications.

320.    Many of the nurses who would do the blood tests and inject Lee with insulin would be told by Lee about the pain he was suffering as a result of not getting the anxiety and panic attack medication, and they would tell Lee, that they would talk to supervisor, tell the doctor or nurse, or in general that they would see what they could do.

321.    It is plausible that one or more nurses did in fact talk to Dr. Rogers and Jane Doe African American doctor, and inform them that Mr. Lee was complaining that he was not getting any medication for his anxiety and panic attacks, that he was in pain throughout the night and losing sleep, but that with deliberate indifference to Lee's known need for the medication, Dr. Rogers and Jane Doe African American doctor did not take action to provide the medication, putting Lee at a substantial, ongoing risk of suffering needless pain for a prolonged period, causing perceived

physical suffering and metal and anguish that has caused long lasting emotion suffering with adverse physical symptoms.

322.    Alternatively, Dr. Rogers and Jane Doe African American doctor Are sued individually and jointly for being deliberately indifferent in their supervision of Nurses, including Nurse Sapp, and for not correcting those nurses who refused to provide Lee with the medication for his anxiety and panic attacks.

323.    John or Jane Does, who fill roles with Defendant Correct Care, with titles, like Regional Manager, Health Services Administrator, Clinical Coordinator, Director of Nursing, Assistant Director of Nursing and Mental Health Director, are sued individually and as policy makers, for putting in place policies, customs and practices to disregard previously prescribed medical orders by a detainee's or inmate's physician, if the medication is expensive; to not provide medication for psychosomatic ailments.

324.    Def. Correct Care is sued for having a customary medical care delivery system, whereby supervisory nurses and doctors are pressured, and even surreptitiously evaluated in part, on the basis of cost of care, which provides incentive for Nurses like Defendant Sapp to withhold medication if it won't cause physical injury but still causes pain not associated with a physical injury.

325.    Def. Correct Care and John or Jane Does, who fill roles with Defendant Correct Care, with titles, like Regional Manager, Health Services Administrator, Clinical Coordinator, Director of Nursing, Assistant Director of Nursing and Mental Health Director, are sued for the custom and practice company wide, of  provide the jail and prisons with limited access to quantities and quality of medication to save costs, which limits the choices of medication to provide by the nurses at the jail, and they avoid providing expensive medication, even if it is prescribed by a

treating physician; they avoid providing pain medication and anxiety or psychotropic medication, and generally provide a minimal level of care, and they provide insufficient access to and the presence of a physician, which makes it impracticable for nurses to timely relay information about detainees and inmates laying information about the conditions of the detainees and inmates to the doctor, or who rarely is at the jail, and most certainly is not readily available for consultation and examination of a patient when it is needed by the nurse on the scene to follow through on nursing pathways to eliminate to presence of serious conditions, creating a substantial risk of harm in a substantial number of cases, that never gets the needed attention of a physician.

326.    Alternatively, All other Jane and John Doe Nurses, RN,LPN or other licenses, whose true name and identities are unknown, Alisha Turvey, LPN, Bevelyn Coping, Chenis Turman, RN, Cynthia Witcher, LPN, Eunice Lowe, Jerrio Wallace, RN, Kimberly Cunningham, RN,  Kenya Ervin, LPN, Kaydeen Porter, LPN, Patricia White,  Rochelle Larry, LPN, Shedericka Edwards, Teresa Leslie, LPN,  and Willie Baldwin, LPN, are sued individually they knew from meetings with Lee to test his blood sugar and provide him with insulin, that he was exhausted from not sleeping, that he was suffering pain and anxiety, that he complained about not getting his medication prescribed for the anxiety and panic attacks, and some of the nurses would promise to tell supervisors or the doctor, others say they would see what they could do, and others would brush him aside saying they only did the insulin, but in the alternative to other theories of liability, none of them ever told a supervisor or a doctor about the suffering that they had personally observed that Lee related to them was connected to not getting medication for anxiety and panic attacks, where the failure to get a supervisor or doctor who would address the need for Lee's medication, was deliberately indifferent by the nurses.

327.    During a relevant period, Ms. Leverett and Mr. Rhodes both were denied medication that had been prescribed by their treating physicians, and both were denied medication that was more expensive than the medication that was provided, by Def. Correct Care if any.

328.    Ms. Leverett, Ms. Owen, Mr. Rhodes and Mr. Mizell all complained of pain that was met with deliberate indifference to an underlying undiagnosed internal problem that was deliberately indifferent not to diagnose and begin treatment for the pain and the internal cause.

329.    Def. Correct Care has a profit-driven motive that in many cases provides medical care that is deliberately indifferent to serious medical need and leaves a substantial number of detainees and inmates in a condition of a substantial risk of harm, like Plaintiff, and like the others whose cases are alleged herein.

330.    Based on the economies of scale the provision of cheaper medical care, withholding and delaying pain medication, withholding and delaying examinations by specialists, creates a policy and custom of deliberate indifference, detainee by detainee, jail by jail, contract by contract, country wide, accomplished  by customs of by a medically dangerous staffing structure, and lack of a doctor's meaningful supervision at each jail, by providing each jail with medication limited by quality and quantity, that drives the adverse care and indifference in cases like Plaintiff Lee's and the others listed herein.

331.    The nurses and physicians delay and refuse to make required medical inquiry with deliberate indifference where it is substantially likely that a serious medical need is substantially likely to exists, but that fact might not be obvious to a jailer or layperson but should be known by a person charged with the duty to provide such care under their particular medical license.

332.    As a direct and proximate result of the above described deliberate indifference, Defendants, Plaintiff suffered pain during the panic attacks, sleepless nights and sever emotional distress and mental anguish each day while in the jail and under the medical care of Def. Correct Care, and continue to suffer anguish thereafter and will with reasonable certainty continue to suffer anguish in the future, and as further proximate result of the challenged negligence, he has developed the adverse symptom of diarrhea associate when he has  to come to Augusta, which interferes with his real estate business in Augusta, his social life, increases dehydration which enhances the dehydration associated with diabetes, causes anguish and embarrassment, and requires that he take Imodium.

333.    The conduct of one or more individuals in causing this denial of the right to be from being placed in a position of a substantial risk of harm, or having to suffer needless pain, was by willful, wanton and reckless disregard, to a serios medical need and the rights of all for which punitive damages are appropriate.

### 334.    Count II: Medical Malpractice

335.    Plaintiff incorporate each and every paragraph above is it fully stated herein.

336.    Def. Correct Care Solutions, LLC is sued and is liable for the medical negligence of any of its employees who at all times hereto were acting within the scope of their employment, and for the actions of any agents or contractors, who failed to comply with the standard of care applicable to  the profession of any person who intentionally or by negligence failed or refused to provide one time or on an ongoing basis, medication to Mr. Lee for anxiety and panic attacks during the period January 10 through February 6, 2017.

337.    In the event that Dr. Rogers and/or Jane Doe African American doctor are contractors who had supervisory duties over nurses employed by Def. Correct Care, who were to provide

medication for anxiety and panic attacks to Plaintiff, but who did not, then he and she is sued in his individual capacity, because he failed to comply with the standard of care applicable to the profession of a physician, and to primary care providers generally under the circumstances and conditions then existing, and the said deviation constitutes professional negligence for which Defendant Rogers is liable.

338.    If Dr. Rogers and/or Jane Doe African American doctor, gave orders or directives to withhold the treatment of Mr. Lee's anxiety and panic attacks of if they followed a Correct Care policy to withhold that medication, then each failed to comply with the standard of care applicable to the standard of care applicable to physicians and to medical care providers generally under the circumstances and the conditions then existing, and said deviation from the applicable standard of care constitutes professional negligence for which defendant Dr. Rogers is liable under Georgia law.

339.    If Jane Doe African American nurse or Nurse Sapp, gave orders or directives to withhold the medication for treatment of Mr. Lee's anxiety and panic attacks, of if they followed a Correct Care policy to withhold that medication, then each failed to comply with the standard of care applicable to  nurses and to medical care providers generally under the circumstances and the conditions then existing, and said deviation from the applicable standard of care constitutes professional negligence for which Defendant Jane Doe African American nurse or Nurse Sapp is liable under Georgia law

340.    Dr. Rogers is sued for medical negligence, and not providing the standard of care required under the circumstances.

341.    As a direct and proximate result of the above described negligence of Defendants, Plaintiff suffered pain during the panic attacks, sleepless nights and sever emotional distress and

mental anguish each day while in the jail and under the medical care of Def. Correct Care, and continue to suffer anguish thereafter and will with reasonable certainty continue to suffer anguish in the future, and as further proximate result of the challenged negligence, he has developed the adverse symptom of diarrhea associate when he has  to come to Augusta, which interferes with his real estate business in Augusta, his social life, increases dehydration which enhances the dehydration associated with diabetes, causes anguish and embarrassment, and requires that he take Imodium.

342.     The acts of these defendants involved willful misconduct, malice, wantonness, and conscious indifference, so plaintiff specifically prays for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

Count III

343.     The Plaintiff incorporates each and every paragraph above as if fully stated herein.

344.     The Sheriff, Richard Roundtree, is sued in his individual and official capacity, as are the Chief Jailer or Administrator of the Richmond County Sheriff's Department and Major Doe, whose true names and identity are not known to the Plaintiff.

345.     Because the supervisor(s) are sued in their individual capacity, he or she may be liable individually, for not only for general compensatory damages, but punitive damages, for which the County would not be liable.

346.     All are sued for actions taken under color of law.

347.     All are sued in their official capacity, where one or more can be final policymaker for oversight, supervision and correction of the medical care provider Def. Correct Care, to fulfill the County's obligation under state and federal law to provide medical care that is not inhumane nor deliberately indifferent to serious medical need.

348.    All are sued for not having in place and implementing affirmative oversight and meaningful investigation, for not avoiding systemic indifference that creates hurdles that prevent notice of harmful medical care to those who can make corrections, and for reacting to notice of problems in a manner that reflected deliberate indifference, that perpetuated the medical care, that by the policymaker's indifference, and left in place a custom and practice of deliberately indifferent medical care by the medical care provider, Def. Correct Care, that can be found to have, by its deliberate indifference, created a substantial risk of serious harm and constitutional deprivation, that proximately caused the challenged injures of Plaintiff.

349.    All are sued for indifferently inquiring for, and upon notice of, medical care provided by Def. Correct Care that created an ongoing substantial likelihood of harm through an apparent custom or practice of deficient care, and for taking action that was indifferent to the problem, that on one or more, or ongoing occasions, placed Plaintiff in a circumstance of a substantial risk of harm, that proximately caused the injury alleged to have been caused by the custom.

350.    All are sued for indifferently inquiring upon notice of medical care provided by Def. Correct Care to Plaintiff specifically that created an ongoing substantial likelihood of harm, and for taking action that was indifferent to the problem, that on one or more, or ongoing occasions, placed Plaintiff in a circumstance of a substantial risk of harm, that proximately caused the injury by indifferent inquiry or by an indifferent response as to Plaintiff specifically.

351.    In 2014 Robert Moody sued Def. Correct Care and for inadequate medical care.

352.    Ms. Leverett died in May 2016, for care discussed above, that could be found to have been deliberately indifferent.

353.    Both incidents put Sheriff, Richard Roundtree, the Chief Jailer or Administrator and Major Doe on notice of the need to inquire whether Def. Correct Care and its agents were

providing medical care consistently with the law or whether each case was just a one of a kind instance.

354.    The Defendants have a system by which detainees and inmates file sick call slips to get medical care and can file grievances about the medical through a computer kiosk, and then someone from jail management, one of the Defendants named in this Court or his or her agent is to address the grievance, and make a good faith effort to resolve the problem, or not be deliberately indifferent, but Lee never got a meaningful corrective action.

355.    If these Defendants were unsure about whether, because of the medical subject matter they could not figure out or understand if as a matter of custom of inappropriate medical care was being delivered a significant amount of time,  or in identifiable circumstances, they had the duty and resources to hire medical professional persons with medical delivery system knowledge to evaluate the performance and failed performances of the County's contracted medical provider.

356.    That those setting the rules for detainees and inmates, like the Defendants listed in this Count, have imposed a rule that if that a person complains two or more times in a week through the grievance computer kiosks, then complaint access is cut-off, is notice of an apparent significant problem, and of the immediate need to engage in meaningful inquiry, which upon information and belief was never done, of if done, no corrections were made in deliberate indifference to the evidence of a custom of indifference.

357.    That any position taken by the Defendants named in this count that these correctional officers do not have the power, authority or and duty to make Correct Care provide adequate medical care, is to delegate a non-delegable to Correct Care, and is no defense, and reflects

notice and indifference to known hazardous medical care on a routine and customary basis, for which the County is still liable.

358.    Any officer named in this Count, who failed to investigate or correct, on notice of an apparent custom of indifference as to circumstances like Lee's or in general, by Def. Correct Care, that cased the injuries complained of by Lee, is individually liable.

359.    Plaintiff Lee indicated that he filed at least two grievances and there was no response or at least no correction in the treatment.

360.    Roscoe Rhoades had asthma that was under control for 19 years when he was put in the jail in November 2016.

361.    It was being controlled by medication and breathing treatments prescribed by Dr. Smith, a physician at the VA.

362.    Def. Correct Care was on notice off Rhodes' need for the prescribed medication and the breathing treatment, but daily during the month in the jail before he was hospitalized for an asthma attack, those treatments were not provided, and he would have been complaining and seeking treatment, and would have exhibited distressed breathing.

363.    On December 21 he had an asthma attack, suffered foreseeable oxygen loss to his brain, and suffered permanent brain injury, and required an emergency visit to the hospital and treatment in ICU.

364.    Mr. Lee entered the Jail in early January 2017, and the Def. Correct knew of his heart condition, diabetes and anxiety, and that were all under control by oral, prescribed medication.

365.    Over about a month, despite notice of the need for the medication daily, by complaints to two or three nurses, no medication for the anxiety and panic attacks was provided, which supports a finding of a custom of indifference.

366.   Nurse Sapp is a defendant in the case involving the death of Ms. Leverett, for some of the acts outlined above.

367.   When Lee told Nurse Sapp of his suffering because he was not getting prescribed medication for anxiety and panic attacks, she said it was all in his mind, and did not provide the medication a physician had previously prescribed.

368.   Mr. Lee believes he filed two or more grievances, and that someone form the jail management, like these named individual Defendants to respond in a timely manner, but Lee never got any response and never got any medication for the anxiety and panic attacks.

369.   Beginning in January 2017 Mr. Mizelle threw up every day for about eleven months.

370.   Mizelle complained daily on an informal verbal basis and through the computer grievance kiosk, and he claims he was locked out at least once a month for too many complaints.

371.   Mizell had an obvious problem with his digestive system, and he was not taken to an appropriate doctor until 11 months had passed of vomiting every meal and a loss of 100 lbs., and yet he had no inquiry from these Defendants or an officer or nurse.

372.   A review of grievances and response in the control of Defendants will plausibly show a custom of inadequate response, or not response to Lee.

373.   It is plausible that parents and family members have complained about inadequate medical care o one or more of the Defendants named in this count.

374.   Defendants named in this count did not make a reasonable inquiry of notice that Plaintiff Lee specifically was not being provided care that was not deliberately indifferent, and that these Defendants failed to remedy violations after learning of them; allowed to continue a custom under which the violation occurred; were grossly negligent in supervising and managing known

deficiencies in the care provided by the contractor for the County; and failing to act on information that indifferent care had been provided.

375.   Under these conditions, most inmates and detainees will complain about delayed or not provided medical care to the guard, and will demand to know when it will be provided, and  in frustration, because the guards cannot control the front line medical providers, some guards will foreseeably try to control the inmate's challenges perceived to be of and at the guard's authority, and will try repeatedly direct them to quit complaining, and if it persists, will take retaliatory action that ranges from indifference to needs, small and large, to physical retaliation, because customarily the medical care is substantially like to expose detainees and inmates to a substantial risk of harm, even if the worst injury does not always occur.

376.   The actions and inactions of one or more of the Defendants named in this Count was in willful and wanton disregard of any person's rights and heedless to the consequences of their failed action, entitling Plaintiff Lee to punitive or exemplary damages.

W H E R E F O R E, Plaintiff prays judgment against one or more Defendants, individually or jointly for the following:

a.     Compensatory damages as allowed by law;

b.     Special damages, as more particularly shown at trial;

d.     Damages for injuries caused by deprivation of Constitutional rights under the United States Constitution;

e.     Punitive damages against each Defendant individually;

f.     Reasonable attorney fees, costs and expenses of litigation under 42 U.S.C. § 1988 and for award of fees under state law.

Any other and further relief so ordered.

A JURY TRIAL IS HEREBY REQUESTED.

Respectfully submitted this the 24th day of January 2019.

/s/ John P. Batson
John P. Batson
Ga. Bar No. 042150
Attorney for Plaintiff Rhodes

Prepared by:

John P. Batson
P. O. Box 3248
Augusta, GA 30914
Phone: 706-737-4040
FAX: 706-736-3391
Email: jpbatson@aol.com